Mr. Fruchter, please proceed. Good morning, Your Honors. May it please the Court, Jack Fruchter of Abraham Fruchter & Tversky on behalf of Plaintiff Appellant John Allegas. This case arises out of Section 16b of the Securities Exchange Act of 1934, the short-swing insider trading profits rule, and specifically Rule 16b6d. The ruling question states that upon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under Section 16b of the Act. The profit shall not exceed the premium received for writing the option. As the District Court found below, defendants violated Section 16b and specifically Rule 16b6d. The Court found below that the defendants disgorged a certain number that they calculated the profits to be to the issuers. You mean they disgorged more? Correct. We are alleging, Your Honor, that in selling these puts, the defendants received cash and non-cash consideration as a premium for those puts, and they arbitrarily wrote down on their Form 4s that they received a penny in premiums, when indeed the premium should include a discount that they received on corresponding calls that they bought at the same time. What's the delta here? A delta is a financial term that we need. What's the delta in this case? What's the additional amount of disgorgement? Oh, the additional amount, well, it depends, Your Honor. But the additional amount would be around a dollar. And the reason for that is because, as Plaintiff alleged, the prices of the puts and the calls. That's the difference between the announced price from the defendants and the price on the market. Correct. So the puts, depending upon which put we're talking about, traded for in the open market at about a dollar, but defendants wrote down on their Form 4s that they only received a penny for this premium. Now, we, the defendants are suggesting that we have no business evaluating these options because this was independently negotiated between sophisticated parties. However, Plaintiff did quite carefully allege in his And they moved in lockstep with the public prices, certainly with respect to the calls. Once you take into account the alleged discount. Does it matter that the calls were not themselves sold within six months? Not at all. The entire Section 16b violation, Your Honor, happens at the put level. Mr. Icahn sold puts, which means under Section Rule 16b6a, that he has acquired the underlying stock. That is a purchase of common stock under Section 16b. When those puts have expired, those — that expiration is deemed to be a sale of those That assumes that the puts are the only thing. And then doesn't the language of the statute — you know, I think it may make very little sense, but doesn't the language of the statute protect him by saying, this is what the premium was, and that is as far as we're allowed to look? Well, first of all, what Your Honor said is quite a mouthful, that it cannot be — And there are other cases that suggest that it cannot be that the SEC promulgated a rule that is so easily avoided. Well, I'm sorry. The SEC and the government often promulgates rules that are stupid. But that's not — you know, the question is, are we here to make sense out of these that, as it is now written, allows people, Sharpies, to take advantage? And there's no doubt that this rule allows people to take advantage. The question is, are we the ones who are to fix it, or is the SEC the one who is to fix it? Your Honor, there are — there are proper measures of Section 16b avoidance. Those measures include removing oneself from the element of a Section 16b claim. And that means that either you didn't buy and sell within six months or that you weren't 10 percent. Isn't there a difference between situations in which there is a — as here, a violation regardless of fault, because that's all you allege, in which case certain things happen and all sorts of other things which come into play when there is bad intent or other things under other SEC rules? Well, Your Honor, this case — this transaction is squarely within Rule 16b6d. But if Your Honor would prefer, I can paint you the picture. The picture here is that Mr. Icahn wants to make a big investment in a company. He doesn't want to lay out hundreds of millions of dollars for buying stock. So he leverages. He buys options. Yet he wants to spend even less money. So he sells puts, takes in a premium that — on puts that he knows will never be exercised, uses that to bankroll the option purchase. This is — notwithstanding the fact that we don't have to get into motive at all, it's quite clear to see how this works to benefit Mr. Icahn and how he made a profit on this. And how it benefits any insider who knows that those puts are not going to be exercised. And I am not suggesting, nor do I have to suggest, that he used inside information or the purpose of Section 16b is prophylactic, that is this a situation in which inside information can be exploited? And undoubtedly it is, because as defendants say — Your argument is essentially somebody who has inside information because of which they think a stock is going to rise, increase in value, can, if we don't go along with you, limit the amount they have to disgorge to X, where they know that the stock is going to rise enough so that they will earn 20 times X. Well, I'll just — well, Your Honor, it's not that. It's also that Mr. Icahn takes in this premium to finance the purchase of his calls. But he's a bright man. He's an extremely sophisticated investor. And he knows, well, these options are going to expire. So I'm going to have to pay back this premium under Section 16b. So I will get no benefit from selling out these puts. The only way I can do that is if I minimize what I know to be coming as my Section 16b liability. How do I do that? I write down on the piece of paper that I called — I only took in a penny for them. Now, how do I do that? It's only by agreeing with my counterparty that, yes, I know that they should be going for a dollar. But you know what? The calls that I'm buying, well, they should be going for a dollar more. So why don't we chop a dollar off of the call price? We chop a dollar off of the put price. You get what you want. I don't have anything to disgorge. And everybody walks away happy. But really what we should be doing is looking at the put option price on the market. Entirely. So let me ask you about, in a somewhat more narrowly focused way, the allegations of the complaint. Because you are, as I understand it, asking us to compare the actual premiums associated with these put options in this case with the Chicago market options. And as I understand it, those are two different — those are two different types of options, right? One is European style. One is American style. Am I wrong or right about that? You are absolutely correct, Your Honor, that these were not exactly the same. Nonetheless, shouldn't — shouldn't we require, as a matter of alleging a complaint, some allegation that the options that you are asking us to compare — because pennies matter — are the same? Yes. And we did, Your Honor. But if — but if your answer to me was, no, they're not exactly the same. The reason — well, the reason they're not exactly the same is because one of them has a feature that cannot be exercised only until the very last moment. But what we did, Your Honor, in the allegations of our complaint, is we chose similar options that should have been more valuable. What do I mean by that? That the option — the exercise time went further than the ones that Mr. Icahn bought. Therefore, there was more time to realize profits. Those options would have been more expensive. But the fact that — But doesn't that get you into the explanation for this, the premium — the profit shall be no more than the premium paid, which was, we don't want to get experts in here telling us that this is more or this is less. So if they were identical, that would be one thing. But aren't you getting us, by this explanation, precisely into what they said they were trying to avoid? And again, I may agree with you that that doesn't make any sense. First of all, Your Honor, this court in Bulldog — Donahue v. Bulldog, only a couple of years ago, found that an insider is a fiduciary. And therefore, when a fiduciary violates Section 16b, he has breached his duty of loyalty to the class. We're there. We're beyond that. We're talking about the amount of discouragement. Right. Exactly. Just one more point.  Your Honor, in Section 16b jurisprudence, profit does not mean what the district court found below revenues over expenditures.  revenues over expenditures. In the 16b jurisprudence, which the entire point is to squeeze every last penny of profits out from the insider, profits has been meant to mean giving the — releasing someone from their debt obligations to the increase in price in another — in another entity's stock portfolio. Profit has been meant to mean any amount that the insider is benefiting of by short swing insider trading. And the way to measure that profit is by the — I'm sorry? You tell us that that's what this regulation says? This regulation says any profit, Your Honor, any profit. Limited to the premium. And, Your Honor, what we are alleging — that's precisely correct, Your Honor. And what we are alleging is that the premium is the cash that was disclosed, as well as the non-cash. And non-cash consideration can certainly be deemed to be profit under Second Circuit law and Section 16b case law. What case — what's your best case for that? Feder v. Frost, which is a Second Circuit case, I believe it was 2001, specifically said that — that the idea that — that profits are limited to all cash consideration is — is gone. And that the whole point is how did this insider profit? And once the insider profited, how do we get it back? And the Second Circuit has also held, Your Honor, that one way to measure those damages is by — that the profit is the consideration given up in exchange. Thank you, Mr. — you're reserved three minutes. Good morning, Your Honor. May it please the Court, my name is Herbert Beagle. Please speak right to the mic. Yes, I'm sorry. My name is Herbert Beagle. I represent the defendant at police. At bottom, the plaintiff's argument here is entirely circular. So I'd like to just — although this was covered extensively in the briefs, I'd like to focus on the word profit. Mr. Fruchter is assuming that the — Mr. Icahn's affiliates make a profit based upon the difference between the call price that he negotiated with his counterparties and the call price of — If we go your way, don't we create a situation — or isn't a situation created in which anybody who has inside information that a stock will rise can simply get a put and a call, discount the call so that the put premium is very low, and have an increase in price in the stock that they get through the call that is many times more than what they have to pay by disgorgement, so that we're creating a situation which anybody with inside information who has half a brain can make zillions? Now, my question is, if that is what is going on, that's absurd, but is it up to us to correct that absurdity or the SEC? Your Honor, it's not absurd, if I may explain why. And there is no incentive. Imagine — this is essentially what the — what the Icahn folks did was a forward contract, in which they commit to buying the stock at a fixed price, which happened to be the market price on the day the call was issued, and then it's paid for later when the call is exercised. The fact is the call was exercised, the stock was bought. Your Honor asked a very important question, which is conceded by the plaintiffs in this case. The call option was never sold. The stock, the underlying stock that was bought, was not sold within six months. So if you forget about the put for a second, and what an investor did was simply buy, in an off-the-market transaction, a call option or a forward contract at a fixed price — You're telling me that because if I buy a stock, and correct me if I'm wrong, on the basis of inside information, which I know will rise, and hold that stock for more than six months, I'm not liable for anything? Well, you're liable for inside information market fraud, perhaps, but you're not liable for the disgorgement under Section 16. No Rule 16 liability. Right. The point of Section 16, and Your Honor hit on this, is that it's a no-intent, no fraud, no mens rea, to coin a phrase from criminal law, involved. It's a technical, mechanical thing. Now, there's a tradeoff when the government imposes a mechanical thing that would cause people financial consequences to with disgorgement, even if they weren't trading on inside information. And the tradeoff is the statute has to be strictly construed because it's automatic. And it's, of course, like the tax laws, it invites those who may be subject to the statute to come up with means to avoid it. That's the whole point, just like income tax avoidance. You are saying that the fact that the put expired within six months doesn't matter because what they got through the call, they held for more than six months. Well, that's right. Because as the statute says, you look at the transaction that is involved that has a purchase and a sale. The purchase and sale here was the put. The put was purchased, and then it expired. That constituted the sale under the statute. The fact is you can't disgorge what you didn't get. They got a penny. Why did they get a penny? They got a penny for a simple reason. Why is there even a put? Because to make it like a forward contract, in other words, to give the counterparty the means to enforce the purchase of the stock within a certain period of time. Look at it this way. Let's say the counterparty wanted to, let's say the counterparty went out on the market and, well, not the counterparty. Let's say somebody wanted to buy the put. What's the point of the put if the call is going to be exercised? Conversely, if somebody in the market wants to buy the put, what's the point when there's a call, when there's a matching call? These aren't just related transactions. You know, there's discussions in the briefs about whether it's integrated. You look at the separate components, what have you. Let's view it as a forward contract is what you're saying. That's right. Integrated doesn't even do justice to what this really is. Let me ask you about the put option and the fact that the, as I understand it, I don't know where the .01 descent number comes from. Well, frankly, Your Honor, I think it's the put option really doesn't even have to be a penny. I mean, I can't read the minds of the two parties when they entered into the contract. One of the contracts doesn't even have a penny. But let's say, just hypothetically, that it was way out of whack with any similar put option. So every put option out there in any market is $1.50 as opposed to a penny. Wouldn't that be a problem? No, and here's why. Because there's a difference that explains the entire $1.50. The standalone put holder has the ability to put the stock to the other side. It can't be canceled or expired by the actions of the other side. Here, the icon, by virtue of the call, the put becomes worthless, except as a device to force the call to be exercised. The problem here is actually that it's the same counterparty, right? This is part of the forward contract that gets a benefit from the call. That's right, which is not the case with standalone puts or standalone calls. If we're only supposed to look at the put option, then there's also an incentive for the counterparty to lowball the amount of the put if they think that they're going to get something out of the call. Well, that's right. Well, but if that's right, then why are we bound by this penny number? The reason you're bound by the penny. Why can't we determine or someone determine that that's actually an artificially low number? Because you have to find a profit, Your Honor. And there's no profit here to the icon folks other than the penny. The profit that Mr. Fruchter is arguing is his artifice that is the discount to the price of the call, not because of a difference in the price of the put, but he's saying take the discount that was received in the price of the call compared to standalone calls and assign that as if it was a premium paid on the put. What if you just got cash from the counterparty? Here you go. I'm sorry. Just a lump sum cash payment. Well, that would have to be disgorged. That would have to be disgorged. Correct. And you're saying that there's a difference between that and these call options which are discounted. Well, because there's no profit to — even if you said conceptually you could allocate a profit on the call to the put, there is no profit because the call was exercised, it wasn't sold, the stock wasn't sold, there's no allegation that anything occurred vis-a-vis the call within the six months other than the purchase of the stock. So what he calls a discount never translated into a profit. If I go into a store and I get a discount of $5 off a suit compared to what the market says the suit for, and I pay for the suit and I never sell the suit, I don't have a profit. I don't have a profit at all. There's nothing for me to disgorge. What Mr. Fruchter is saying is take the discount, which has never become a profit, and assign it to the put as if that's a profit. And that just doesn't work. I think that's what happens here. And I want to just go back to the point I made because I think it's an important point about this statute. We can all have our opinions of what should or should not be done legislatively to protect against potential insider trading, but this is a statute that basically says we don't care whether you trade it on inside information. We don't care. If these particular things happen in this particular way within six months, you've got to pay that money back. The point here is that no one, as we point out in our brief, would ever sell ICON, a call that was subject to volatility because of the type of investor he is, which he creates his own volatility. As soon as he buys a stock, as soon as it's announced, the price goes up. And what the counterparty here wants to do is make sure that this is going to be a purchase at a fixed price. You know, one of the things mentioned in the brief is timing. It's not just timing. If you look at the cases, the recent decisions, it's timing and price. Because in the typical stand-alone call and stand-alone puts, timing is relative to volatility because the timing, the length of time that the option can be outstanding has a certain volatility factor which affects the price. Where the price is fixed on day one, as it is with the forward contract, timing becomes irrelevant, slash volatility becomes irrelevant. It's all about whether the parties bound themselves to a fixed price on day one, and that was true of both the puts and the calls in this case. So I believe that the lower court decision was properly reasoned and consistent with Second Circuit law, and the dismissal should be affirmed. Thank you very much. Your Honor, two points, Your Honor. First, Mr. Beagle has spoken about how he believes this is the correct valuation of the put, put at a penny. Nonetheless, in the defendant's brief on page 15, they claim it's self-evident that no one would pay as high a premium as something in the open market. Then they claim the subject put lacks not just optionality but no independent value. The put, there should be no premium for the put. But then on page 31, they say, well, this is, as Mr. Beagle just said, this was very valuable, because no counterparty would ever sell these calls to Mr. Icahn unless he was giving them the put. So they're not sure what this thing is worth. And for the lower court to just accept Mr. Icahn's determination in briefing that this is a correct valuation. But the other thing that he says, and maybe this is the second thing that you're going to address, is that there is no profit associated with the call option. The call option, that is a mishearing. That is a misdirection. The call is irrelevant to this section 16b option. Instead of call, Your Honor, I say to you, I'm going to give you a discount on a put option, but you know what? Instead, I want to buy you a Mercedes. Don't sell me that Mercedes for $50,000. Sell me the Mercedes for $40,000. So what Mr. Icahn is saying is, somehow, because there's a word call and a put and a delta, that you can't match this. This is just a separate consideration for a put option. Therefore, would anybody seriously suggest that if that arrangement were made, that he didn't profit on $10,000 on his discount on the Mercedes? Of course he profited. He used his put, gave it away for nothing to get a $10,000 discount. And that's what Mr. Icahn did here. He took his puts. He gave them away, which on page 31 of the brief is a very valuable thing that no counterparty would enter into in their right mind, and he gave it away for nothing. And shockingly, the exact discount that we're alleging happened in the market all of a sudden gets shaved off of his prices of his calls that he has to pay out, saving himself the money and not having to pay out any section 16b liability. The call option is just misdirection. It's just the call option is the consideration for the put. In some ways, although he started out by describing it as a forward contract, I don't know that he would disagree. He just says, look, these put options, there is a valuation and ---- There may be, Your Honor, but the place to value that when they don't even know how to value it in their own briefs is not at a district court level, and to accept all of defendants' allegations is true. Plaintiffs made real plausible allegations. You agree that if somebody buys some stock and holds it for more than six months, then unless some other sections that you haven't alleged apply, there is no violation and no disgorgement. Sure. That's the rule, Your Honor. Yeah. That's not what happened here. Well, that's the question, whether that is somehow what happened here and the existence of a put was, because of the way the regulation is written, limited to a certain amount. No, Your Honor. That's going with Mr. Beagle's misdirection. You're talking about the call that was never exercised. That is irrelevant to this. I understand what you're saying. The put is the sole place where a Section 16b purchase and sale occurred. The question is, what was the premium that Mr. Icahn received for selling that put? We're saying it's clear as day that the arbitrary mark of a penny, while the fluctuation in the market price and the exact lockstep discount of call and put, it's self-evident that he got paid in other consideration. But is it right that no matter what, this is the other thing that your adversary said, more or less, no matter what, Mr. Icahn was going to be on the hook for buying the underlying shares? He was, if you exercise the call. Yeah. But let's remember, Your Honor. He had to do one or the other. That doesn't matter, Your Honor. He was trying to reduce his cost. And how do you reduce your cost? I'm selling something worthless in consideration of something valuable that I know I will never be exercised. I just reduced my cost. Your Honor, if I may give just one example. If the puts were worth $1 and I wanted to sell 1,000 of them, I would have sold $1,000. I would have taken in $1,000. If the calls are worth $10 and I wanted to buy 10,000 of them, I would have had to pay out 10,000 and I would have had to take in 1,000. I would have netted out $9,000. But once you put in the Section 16b component, well, I'm going to have to pay that 1,000 back. So this is going to enter the under Section 16b discouragement. So therefore, this is actually going to cost me $10,000. How do I get the benefit of my sale without having to disgorge it? I write down a penny. Isn't he simply cleverly finding a way, let me finish, of buying the stock for less. And if he is doing that, then don't we look to the stock and whether he held it for six months. Now, the way that he cleverly got the discount was by doing something else. You say look at the something else. And the question is, which do we look at, given the language of this statement? That that's clever is to say that anybody, insider of IBM, bought and sold stock within six months. But you know what? When he sold it for $80, he wrote down on his Form 4 $3. That's all he did. He took in 80 and he wrote down an arbitrary number, a penny, with no connection to reality. And if that's the way we're going to now avoid Section 16B, by just making up numbers out of air, well, then it's just useless. This statute was adopted in 1934, right? Indeed. You seem to be raising what might be called a large question under this statute. Isn't it odd that it's never come up before, or has it come up before? Your Honor. How original is your theory? Your Honor, the legs of this case are not original. Section 16B.6d, sell an option, it expires, you get the — that's Rule 16B.6d. The fact that a profit can include non-cash, that's going back to 1956. That's it. He used something as consideration for some other security, and he purchased it. There is nothing novel. This is as old as Section 16B. A question that was asked, I think, is has a transaction like this occurred in all the years that these — this statute regulation thing, and has anyone brought your argument in the face of such a transaction before? I believe that was the question, and I'd like to hear the answer to it. If your Honor is asking me has anyone brought a case when the insider sold something but didn't receive cash for it that nonetheless was required to be disgorged, the answer is yes. If you're asking me did anyone sue Carl Icahn over this transaction — No, no, no. You're playing games with me. Has — I don't care whether it was Icahn or Schmeichan. I want to know whether a transaction like this, not another transaction in which profit might be called something else, but whether a transaction like this has occurred in the years that this has been there, and somebody has come up with your argument. That doesn't mean your argument is bad. I'm just interested in whether it happened. But my question is, Your Honor, if you're saying has anyone ever taken an instrument that had two separate derivative rights, broken them up, and said yes, Checkerley v. Sterling, where the Court specifically said, which is a Second Circuit court, where the Court specifically said, what did the insider do here? He was taking an option, a put option, that he knew to be worthless, and he was using it as consideration for a call option. You have told us that several times. Okay. Thank you very much. We'll reserve the seat. Let me — Yes, please. May I just ask one more question? What would be wrong with a rule? Forget about the broader rule. Just let's look at the allegations in this case, because it was a motion to dismiss, with requiring allegations about — to show that the put options at issue are identical to the put options that you allege are comparators, because that's — A call option. The put — You're talking about the put options that were privately negotiated with the put options that were publicly available in the CBOE. Correct.   And the answer is, that's an extremely difficult thing to do, because Mr. Icahn is an extremely successful and sophisticated investor. Well, that may be very difficult, but what's wrong with the — So he can go into the counterparty, and he can arrange his own terms. If on the market, a stock — they're selling options on Herbalife that will expire on May 30th, Icahn could go to his counterparty and say, you know, May 30th doesn't really work for me. I want options that expire on May 28th. He can negotiate that. So the fact that he can negotiate whatever specific terms he wants means that you can't do — So maybe I misunderstand the market, but I always thought that, you know, there are these valuation companies that can figure out whether this is within a range. So what's — why can't we require that as an allegation? Well, we did do that. If Your Honor is saying that, again, that this is a question of valuation, was the penny right because of some other call, well, then, Your Honor, that's a factual issue. How can we do that on a motion to dismiss when everything plaintiff says is supposed to be acceptable? Well, we can require that you provide us with comparators that are a little closer to the actual put options here. So what Your Honor — I'm just asking a question. Your Honor, what we tried to do was actually put things that were less — you know, that were actually more valuable out. We picked further strike prices and further times to expiration so that they would be worth even less. And nonetheless, Mr. Icahn's prices were still less than those prices. So something is off with your — clearly, your any — by any option announced. Just a question. Did you, in your statement, allege that the put options that you brought in were actually worth less than the ones would have been here? Was that an allegation that you made? The allegation was, Your Honor, that the put options that Mr. Icahn actually purchased — No, I — — mirrored the ones that are in the — I understand that your allegation was that the put options that he had were worth more than that. But given Judge Lohier's question about the difference in who has a burden of pleading, did you — you now tell us that the ones you brought in were not the same but actually were a fortiori. But did you allege that they were a fortiori? First, let me just address what Your Honor said about the pleading and the burdens. As we suggested earlier, under Bulldog and — We have — The burden is on defendants. Could you just answer the question? I mean, I — we have your other argument. It's a powerful argument. Did I allege if the put options that Mr. Icahn purchased were identical to the — No, I didn't say that you should have alleged that they were identical, but that you have been saying, well, they were not identical. They were, in effect, a fortiori. They were even more so. And my question is, did you allege that they were either identical or a fortiori? Was that an allegation made in that? Then the question, if the allegation is made, whose burden is it to do one thing or another? Can you do it on dismissal? But I'm just interested in whether you made that allegation. We made the allegation that they were at least as valuable as the ones in the open market. Thanks very much, Mr. Lefort. Appreciate it. You've had, as you know, more than the originally scheduled time, and we're grateful for the arguments of both counsels. Thank you. Your Honor, if I may — Go ahead. Sure. Go ahead. It's not accurate when Mr. Fuchter said Mr. Icahn bought the stock for less than the market price, and connoting that by virtue of the call and the exercise price, he got a bargain. He — the call premium plus the exercise price equaled the market price on that day. There was no discount to the purchase of the stock whatsoever. I just wanted to make that clear. On the call option side. On the call option side. And the bottom line is Mr. Fuchter is not just looking at the put versus what stand-alone puts go in the market. He wants to transfer what he claims is a discount on the call premium to the put. There's — that claim has never been brought under this statute. Never, to answer your question. Thank you. Thank you very much. We'll reserve the decision.